Parker C. J.
delivered the opinion of the Court. [After stating the pleadings.] The principal question made at the trial, as appears by the report, was whether the agency, to which the bond has reference, did not cease in September 1816 ; and this question does not seem distinctly presented by the pleadings, for the point of the issue is, whether H. Messinger had not in his hands, on the 22d of December 1822, stock, funds and money, belonging to the company, which he had received as agent, that is, as such agent as is mentioned in the bond, and had refused to pay over &c. *247 Now this might be, that he then had in his hands such stock &c., which he had refused to pay over, although he had ceased to be agent six years before, and if true, the bond is forfeited. The rejoinder should have averred that he ceased to be agent on the particular day supposed, and that up to that time he had accounted &c., according to the condition of the bond. But as the duration of the agency, in relation to the liability of the obligors, and particularly of the sureties, and the legal effect and duration of the bond as a security, have been fully argued, the opinion of the Court will be given on the principal questions, rather than that the parties shall be delayed on account of the form of the pleadings.
The condition of the bond is very general in its terms, stating nothing of the character or duties of the agency to which H. Messinger had been appointed, nor referring to any vote, record or document, by which those duties were defined or limited. In this respect it is unlike the bonds given by cashiers of banks, clerks of mercantile houses &c., whose duty may be ascertained by usage, if not particularly defined. What is the particular duty of an agent of a hat manufacturing company cannot be well ascertained by usage, because probably this was the first company of the kind ever established in this commonwealth. All that can be gathered from the condition of the bond is, that this agent would have in his possession, funds, stock and money of the company, for which he was liable to account, and for his fidelity in regard to which the bond was designed as security. This is mentioned to show the necessity of going out of the bond, to ascertain the degree and duration of the liability of the obligors ; for it will not be pretended, whatever may have been the personal liability of H. Messinger, that this bond will cover, or that the sureties are liable for, any transaction of his, which was not, according to the true intent of the parties, within his proper duty as agent, at the time when the bond was executed ; and as a termination of his agency, as then understood, would of course limit the liability of his sureties, it is proper and necessary to inquire, by extrinsic evidence, into the nature of the agency, in order *248 that the sureties may be protected from claims to which it was never intended they should be subject.
It appears then from the facts reported, that the company * had one agent at the place where the hats wore manufactured, whose duty it was to superintend the business there, and that the defendant, H. Messinger, had the charge of a store belonging to the company, and that his duty was to deliver hats to the proprietors, keep accounts with them, receive their promissory notes and deliver them to the treas urer of the proprietors, and to sell to any persons, other than proprietors, by wholesale, for which services he was to receive a commission of two per cent., and to sell by retail to any persons, for which he was to receive eight per cent, commission, he guaranteeing all debts for sales by retail. The particular manner in which he was to perform his duty wras prescribed by a vote of the 21st of December, 1814; and this probably shows the nature of his duty before that time, there being then no change in the business. It must be presumed that his sureties had regard to this course of transacting business, when they consented to become responsible, and if it should be materially changed, so as to increase their risk without their consent, they would in equity be exonerated from their liability ; and if the principles of equity in relation to sureties are adopted and enforced at law, the bond would be avoided. This is conformable to the principles of justice, and to the essential nature of contracts ; for if an obligation is valid because it is evidence of the consent of a party to be bound, it surely cannot be converted into a different engagement which never had his consent; and we find that cases decided both at law and in equity have recognised and enforced this principle of natural justice.
In the case of Samuell v. Howarth, 3 Meriv. 272, the obligation of a guarantor was limited in its effect by the pro.b-able intent of the parties and the usage of business. A guaranteed payment of any goods to be supplied by B to C between the 2d of April 1814, and the 2d of April 1815. No term of credit on which the goods should be sold by B to C was specified. It was held that this was not a guarantee for an unlimited period of credit, but that it was to be re *249 strained by the usual course of trade. C, the purchaser, accepted bills for the amount of goods delivered, which B permitted him to renew when payable, without any communication with A, and it was held that A was discharged from his guarantee, by virtue of the rule, that a creditor giving further time to the principal debtor, without the consent of the surety, releases the surety ; and this, notwithstanding the renewal was allowed in consequence of C’s inability to pay, and no injury could happen to A ; the surety being himself the fit judge of what is, or is not, for his own benefit. The Lord Chancellor said, “ It is firmly established that the same principles W’hich. have been held to discharge the surety in equity will operate also to discharge him at law.” “ The rule is this, that if a creditor, without the consent of the surety, gives time to the principal debtor, by so doing he discharges the surety ; that is, if time is given by virtue of positive contract between the creditor and the principal, not where the creditor is merely, inactive.”
So in Boultbee v. Stubbs, 18 Ves. 20, a creditor having, among other securities, a bond with surety, took a mortgage from the principal debtor and agreed to receive the residue by instalments, secured by warrant of attorney &c., and it was agreed between them that this should be without prejudice to any security he then held ; an injunction was granted against suing the surety.
The case referred to as the leading case on this subject, is Nisbet v. Smith, 2 Bro. C. C. 579.
So in the case of the Bank of Ireland v. Beresford, 6 Dow, 233, in the House of Lords ; commissioners under an act of Parliament for giving aid to merchants, made an advance for A, who with B, his surety, became bound to pay within a limited time ; A obtained several extensions of credit without the knowledge of B, and then became bankrupt, not having paid ; and proceedings at law against the surety were restrained, the obligation being discharged by the indulgence.
Rees v. Berrington, 2 Ves. jun. 540, is a case of the same nature. Lord Loughborough said, when a man is surety *250 at law for the debt of another, if the obligee defeats the condition of the bond, he discharges the surety.
The foregoing are chancery decisions, but the following . . , . . cases at law are not less decisive.
In the case of Lord Arlington v. Merricke, 2 Saund. 410, which was debt on a bond given by a deputy postmaster and his surety, the condition of which was that he should be faithful &c. during all the time that he should continue in the office, account for all moneys Stc., the words of this condition were restricted in their operation to six months, that time being recited in the bond as the term of the appointment. Here, although by the express words of the condition the obligors were to be answerable for the fidelity of the officer during all the time he should continue in office, the recital' was used to qualify and restrain these general words, upon the presumed understanding of the surety of the extent of his liability at the time when he assumed it.
The case of Wright v. Russell, 3 Wils. 530, and 2 W. Bl. 934, was settled upon the same principle of equitable construction. So in the case of the African Company v. Mason, cited in 1 Str. 227. And the case of Barker v. Parker, 1 T. R. 287, was settled upon the same principle.
The facts vary in these several cases, but the point of them all is, that the surety shall never be charged beyond the scope of his engagement as understood by him at the time when he entered into the contract; or rather, beyond the purpose and object of his undertaking. In the case of Barclay v. Lucas, 1 T. R. 291, note, cited by the plaintiff’s counsel, I confess the decision appears to me to be founded upon a very subtle distinction between an obligation to a house or firm, and one to the individuals of a house, but the principle of the other decisions is not intended to be infringed ; and in Strange v. Lee, 3 East, 490, the case of Barclay v. Lucas is spoken of by Lord Ellenborough rather doubtingly. Dance v. Girdler, 1 New Rep. 34, is a pretty strong case to the same point. But in 2 New Rep. 175, there is a case (The Wardens of St. Saviour’s v. Bostockwhich more nearly resembles the one before us. A, B and C entered into a bond as sureties for D and E. The condi *251 tion recited that D was appointed collector of the church rate of the parish of St. S., by virtue of which office he was empowered to collect and receive all such moneys as were rated and assessed on the inhabitants by virtue of that rate, and for which he was accountable to the wardens of the grand account, and bound the sureties for D’s accounting for all moneys collected or received by him on account of the above rate, as also on all and every other rate or rates thereafter to be made and collected by him. It was held that the parties were only answerable for D in that single appointment, and not in his appointment in the ensuing year.[1] Here there was no limitation of time in the condition of the bond, but as the office was an annual one, though not so stated in the condition, the obligation of the sureties was limited by an equitable construction of their contract, and the probable intent of the parties. These several cases show that at law, as well as in equity, the liabilities of sureties are always construed by the subject matter, the usage of the business, and the real views of the parties at the time when the burden is assumed, however general or forcible the terms may be in which the contract is expressed.[2]
The case in 1 Gaines’s Cases in Error proves that in New York the same principle is recognised, and applied to a different state of facts. The surety was held not liable, because the goods which were to be consigned to a house m *252 Hamburgh and sold there, were by the consignee sent from there to Rotterdam and there sold, on account of difficulties in business in Hamburgh.
The principle being so clearly settled by authorities, that the contract of a surety cannot be varied without his consent, and that any new terms, important in their nature, imposed upon the principal, or consented to by him, will avoid the obligation as to any act done after such alteration, we are to see whether the facts reported in this case prove a termination of the agency of H. Messinger in 1816, or so varied the terms and conditions of that agency as to annul the same, so far as relates to the bond given by the defendants.
From the time of executing the bond in 1810, until the 1st of September 1816, the duty and employment of H. Messinger, as agent of the company, was to superintend the delivery of hats to the proprietors from the company’s store in Boston, keep accounts of the same, receive the notes ol those who took the hats and deliver them to the treasurer, sell hats by retail for them and render his accounts therefor periodically ; for all which he was to be at no charge for rent or labor, but was to have a commission of two per cent, on the hats delivered to proprietors, and eight per cent, on those sold by retail, he guaranteeing the debts created in this part of the business. This was a safe business on the part of the agent, and occasioned no great risk to" his surety; for he was not thereby to become indebted to the company, but the business was transacted in their name and the property remained theirs. In September 1816, the company suspecting the business was not profitable, a committee was appointed to look into the affairs of the store, and they reported to the company that it was inexpedient to continue the business in the same form that the store ought to be given up, and that the president and directors should contract with some person to dispose of the hats in future, in such way as should best promote the interest of the concerned ; that a person should be employed to put all the hats in the store in Boston in good order, and that those which were imperfect should be sold by auction. This report was accepted at the same meeting. We think it impossible that a more unequivocal *253 termination of an agency should have taken place. The store where the agent ‘ transacted business was to be given up, a new agency was to be created, and the hats were to be taken out of his custody. The parties considered it so at the time. The company, the agent and the surety were all present and acquiesced in this state of things. Unless this vote was rescinded, and it is not pretended that it was, H. Messinger could no longer transact the business of the company, but under a new contract, express or implied. And we accordingly find that he made propositions for the new agency, on terms wholly different from those of the former one. He was to deliver the hats in cases to the proprietors from his own store instead of theirs ; he was to be supplied with hats for retailing on his own account, and he of course was to become indebted to the company for the hats he should thus take to sell. This shows very clearly, that all concerned considered the former relations of H. Messinger to the company as concluded ; and at that time the bond given by him and his sureties ceased to operate upon any future act of his. They did not become answerable for him in this new agency, and their bond, without their express consent, could not be made applicable to it. The risk was altogether different; before, the agent exposed his sureties to no peril but his want of honesty, and fraud or embezzlement; now, they were exposed to all the hazards of trade, rise and fall of. the market, loss by fire, bad debts, and in every other way ; besides which, the agent, instead of being free of expense on account of the business and being upon commissions, was to be at the expense of a high rent, besides the other charges of a store, and thus to be sure, if business should not be profitable, of falling in arrears. A greater difference can hardly be imagined. It is much greater than existed in any of those cases in the books where the surety was discharged. The only answer that can be suggested to all this is, that Daniel Messinger, one of the sureties, was present and consented to the change. No doubt as a corporator, and perhaps as an individual, he did. He consented that the business should be broken up, and that the agency should be terminated, and that a new agent should be chosen, and perhaps, that the same *254 person should be the new agent; but what evidence is there that he consented to stand bound for this new agent ? We see none. On the other hand, there is evidence that the company consented that he should cease to be liable. Nothing was said about continuing the bond. But on the con trary, in 1822, when difficulty was apprehended and a committee was appointed to make with the agent an adjustment of his accounts and to obtain security for the balance in his hands, this committee reported, among other things, that he refused to give any security but himself. This fact has a strong tendency to show that neither the company, nor any member of it, contemplated any security in the bond which is now resorted to. Now under such circumstances, if it be law that a surety who is bound for the- faithful execution of the duty of an officer so long as he shall continue in office, is held only for one year in case it be an annual office, the reason certainly is as strong for the liability to cease where the office itself was abolished, and all parties had acted as if the security had also ceased. And indeed from the very terms of the condition the bond had ceased to operate.
A question remains as to the balance found to be due from the agent in 1816, when the business was' changed by the vote of the company. It is staled that this balance was not of cash, but of stock on hand, debts due to the company, &c., for. which he was liable by virtue of his agency and of his bond. The question on this part of the case is, whether the transactions subsequent to the 13th of September, 1816, did release the surety from his obligation. There seems to be difficulty in distinguishing between principal and surety in a joint suit against both upon the bond. There are some circumstances which, according to the cases cited, will go to discharge the surety, and yet which ought not to discharge the liability of the principal; such as further time given to the principal at his request, or taking new security with further credit. As the defendants have joined in their defence, and perhaps were obliged to, the bond, if valid against one. must stand against both ; and there would be no remedy in a suit at law for the surety, if any thing were due from the principal which could be recoveted against him upon the bond *255 Probably in a case where the debt remained against the principal, but the surety was entitled to relief in equity, a court of equity would restrain proceeding at law against the surety. In the case before us, however, we think the bond itself discharged by a performance of its condition as understood by the obligees themselves. The balance of accounts exhibited in the last settlement before the agency closed, was carried to the account of the agent after his new appointment, and he was debited therewith ; payments were successively made during six years, and the balance continually changed, so that a much larger sum had been paid over by the agent than the amount of that balance. A new debt was created by this course of proceeding, for which the agent alone was personally liable. He had accounted thus with the obligees, pursuant to the condition of the bond, and in a manner satisfactory to them, and the case is thus much stronger than the one cited, where the obligee had taken a mortgage from the obligor and allowed him to pay by instalments, or that where the commissioners allowed the debtor to the government further time of payment, or that in which the creditor had given to the vendee of goods longer credit than was usual among merchants. It is the same as if the company, on breaking up their business in 1816, had taken a promissory note from the principal for the balance, payable at a distant day, thus disabling the surety from compelling payment or obtaining any security from the principal.
I think by analogy to the cases which have been decided, m which giving time to the principal shall discharge the surety, that the surety must in this case be discharged ; that a new debt was created against the principal himself by carrying this balance to his debit, after the bond had ceased to stand as security for the agency. If it be not so, a surety for an officer or agent would be in a dangerous predicament. The creditor, instead of calling on the surety when the balance is ascertained, debits the principal with the amount, or perhaps takes his personal security for it; the surety in the mean time, not being called on, rests in security; the creditor goes on dealing with the debtor, putting property into his hands and receiving payment from time to time from him, *256 until in the end the debtor is unable to pay, perhaps rendered so by this new mode of dealing, and the demand is made upon the surety, when all opportunity of indemnifying himself is lost. This certainly is - not just, and the law will protect the surety, by considering the opening a ,new account with the principal, charging him with the balance and covering it with numerous advances and payments so that it cannot be distinguished or ascertained whether it has been paid or not, as an extinguishment of the claim on the bond.[1] No case precisely like this has been cited or found, but this result seems to be required by the principles which have been adopted and sanctioned by courts in relation to the rights and duties of sureties.
As to the testimony rejected, which went to prove that H. Messinger, one of the defendants, admitted that his agency continued, and was secured by the bond, there certainly is a difficulty. The confession of one obligor as to certain'points may be evidence against both, but where the question is, whether a surety shall be held, the principal having no legal interest in that question, it cannot be right that his declaration should affect his co-obligor.[2] But the testimony was immaterial ; since the confession of a party as to the legal effect of his contract cannot bind him, it surely ought not to bind others who may be joined with him. The confession of a particular fact may be different.

Judgment according to the verdict.

 See Dedham Bank v. Chickering, 3 Pick. 335 ; Peppin v. Cooper, 2 Barn. & Ald. 431 ; Leadley v. Evans, 2 Bingh. 37 ; Hassell v. Long, 2 M. & Sel. 364 ; S. Carolina Society v. Johnson, 1 M‘Cord, 41 ; Union Bank of Maryland v. Ridgely, 1 Harr. & Gill, 327, 432 ; Kennebec Bank v. Turner, 2 Greenl. 42.

 See Millar v. Stewart, 9 Wheat. 680, (5 Pet. Cond. R. 727;) United States v. Kirkpatrick, 9 Wheat. 720, (5 Pet. Cond. R. 733;) Whitcher v. Hall, 5 Barn. & Cressw. 269 : S. C. 8 Dowl. & Ryl. 22 : Eyre v. Bartrop, 3 Madd. 221; Bowmaker v. Moore, 3 Price, 214. It was held in Eyre v. Bartrop, supra, that, if by any arrangement between the debtor and creditor the situation of the surety be altered, the surety is discharged; and in Millar v. Stewart, supra, Mr. Justice Story says, that it matters not, 11 that the surety may sustain no injury by a change in the contract, or that it may even be for his benefit. He has a right to stand upon the very terms of his contract; and, if he does not assent to any variation of it and a variation is made, it is fatal.” 9 Wheat. 680. See Wright v. Johnson, 8 Wendell, 512; Combe v. Woolf, 8 Bingh. 156 ; Bank of Washington v. Barrington, 2 Penn. 27.

 See Bordenham, v. Purchas, 2 Barn. & Ald. 45 ; Clayton’s case, 1 Merivale, 572 ; Simson v. Ingham, 2 Barn. & Cressw. 65 ; ante, 125, n. 1.

 See 2 Starkie’s Ev. (Metcalf's ed.) 48 ; 3 id. 1386 ; Hayes v. Seaver, 7 Greenl. 237 ; Foxcroft v. Nevens, 4 Greenl. 72.